

## AMENDED AND RESTATED COMMERCIAL LEASE

**THIS AMENDED AND RESTATED COMMERCIAL LEASE** ("Lease") is made the date the last party executes this Lease, ("Effective Date") by and between **MEX RE-SW-TX LLC**, a Wyoming limited liability company, having a mailing address of 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022 ("Landlord"), **FOX FUELS RETAIL GROUP, LLC**, a Texas limited liability company, **ATL HOLDINGS LLC**, a Wyoming limited liability company, and **AMIT SONIMINDE**, an individual resident of the State of Georgia, having a mailing address of Box 408, Suite 6, 1000 Peachtree Industrial Blvd., Suwanee, Georgia 30024 (hereinafter jointly, severally and collectively, "Tenant").

### W I T N E S S E T H:

**WHEREAS**, Landlord has a leasehold interest in the real properties commonly known as Mountain Express Stores with the following addresses:

| | |
|---|---|
| #588 | 4243 W. Pioneer Drive, Irving, Texas 75061 |
| #589 | 3603 Marvin D Love FWY Dallas Texas 75224 |
| #781 | 110110 Harry Hines Blvd. Dallas Texas 75220 |
| #793 | 4290 South Beltline Road, Balch Springs, Texas 75181 |
| #794 | 180 Murdock Road, Dallas, Texas 75217 |
| #795 | 8620 Lake June Road, Dallas, Texas 75217 |
| #797 | 5001 South Buckner Blvd., Dallas, Texas 75217 |
| #799 | 2600 East Highway 30, Mesquite, Texas 75225 |

(hereinafter, the "Premises"); and

**WHEREAS**, Tenant desires to operate a business on the Premises and the parties hereto wish to enter into this Lease for the rental of such Premises on the terms specified herein.

**NOW THEREFORE**, in consideration of the mutual undertakings contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **PREMISES.** Landlord, in consideration of the covenants and agreements to be performed by Tenant, and upon the terms and conditions contained in this Lease, does hereby lease, demise, let and deliver to Tenant, and Tenant, in consideration of the covenants and agreements to be performed by

Store # 588, 589, 781, 793-795, 797, 799

Landlord and upon the terms and conditions contained in this Lease, does hereby lease from Landlord, the Premises, including all of the property, improvements, and related gas and convenience store equipment located inside the convenience store on the Premises, to have and to hold for the Term and Tenant acknowledges receipt and delivery of complete and exclusive possession thereof.

**2.     TERM OF LEASE; OPTION TO TERMINATE.**

2.1 *Term*.  The Term of this Lease shall begin on April 1, 2023 ("Commencement Date") and shall continue for six (6) months from the Commencement Date ("Term").  At the end of the initial Term or any extension or renewal thereof, the Term shall automatically renew each month on a month- to-month basis thereafter unless either party gives written notice of non-renewal to the other party no less than ninety (90) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided.  The commencement and enforcement of this Lease is expressly contingent upon the termination of any existing lease agreement encumbering the Premises.

**3.     MONTHLY RENTAL FEES; SECURITY DEPOSIT.**  Tenant agrees to pay Landlord a monthly base rental amount equal to the sum of One Hundred Fifty Thousand and 00/100 Dollars Triple Net ($150,000.00 NNN) during the Term (the "Base Rent"), as allocated on Exhibit A attached herein.  The collection of the Base Rent shall begin April 1, 2023.

**4.     RENTAL PAYMENTS AND FEES.**

4.1     (a) *Rental.*  Tenant agrees to pay Landlord the Base Rent, in electronic form (ACH) to Landlord's bank account, or in any other manner as designated by Landlord in writing to Tenant, promptly on the first (1st) day of each month during the Term hereof.  Tenant shall provide Landlord with such banking information and authorizations as needed for the payment of rent in ACH form. There shall be a One Hundred Dollar ($100.00) fee for any bounced ACH draft.  In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

4.2     *Reserved*.

4.3     *Late Fees.*  Tenant agrees to pay Landlord, promptly at the times and in the manner herein specified, all amounts due, without deduction, setoff, abatement, counterclaim or defense. If any amount due is not received by Landlord on or before fifteen (15) days following the date on which it is due, Tenant shall pay Landlord a late charge equal to five percent (5%) of the amount of such past due payment, notwithstanding the date on which such payment is actually paid to Landlord. Failure for Tenant to pay any amounts due hereunder on or before the due date constitutes a default hereunder, however, Landlord's election to accept amounts due after the due date shall not operate as a

Store # 588, 589, 781, 793-795, 797, 799

waiver or modification of the amounts due or payment terms for any subsequent months.

    4.4 *Administrative Fees*. Tenant shall pay an annual $100.00 administrative fee per Premises location payable to Landlord upon the inception of the initial term of this Lease, and on each anniversary date thereafter during the remaining term or any extended term thereof. Tenant shall pay a $200.00 monthly administrative fee payable to Landlord on the first day of each month during the initial term and any extended term of this Lease.

    4.5 Merchandise Inventory. Tenant agrees to purchase from Landlord the existing merchandise inventory currently held at each Premises location for resale to the public. Such payment to be made to Landlord for such inventory at each Premises location immediately following the count of the inventory and pricing of such inventory by an independent third party contracted by Landlord at such Premises location.

  5. **UTILITIES, COMMON AREA MAINTENANCE, TAXES AND OTHER AMOUNTS.**

    5.1 *Utilities.* Tenant shall bear responsibility for and pay all utility bills, including, but not limited to, water charges, sewer, gas, electricity, fuel, telephone, light and heat for the leased Premises. Tenant shall also bear responsibility for and pay all charges for garbage collection services or other sanitary services rendered to the leased Premises or used by Tenant in connection therewith. If Tenant fails to pay any of said utility bills, charges for garbage collection or other sanitary services or other amounts due, Landlord may pay same and such payment may be added to the rent next due. Landlord and Tenant acknowledge that, as a courtesy to Tenant, Landlord shall maintain all utility services in its name and Tenant shall pay for such utilities as provided herein up to and including February 28, 2023, at which time all utility service accounts in Landlord's name shall be disconnected and Tenant shall have established utility services in its name and shall thereafter pay for all utilities as provided herein.

    5.2 *Taxes.* Tenant shall pay all Taxes relating to the Premises to the Landlord on a monthly basis, with one/twelfth (1/12) of the total amount of annual taxes (based on the immediately prior tax year), and Landlord shall make the payments to the taxing agencies when such payments are due. Landlord shall give the Tenant a notice annually stating the amount of monthly tax payments payable to Landlord under this Section. "Taxes" means all federal, state, local, governmental, special district and special service area taxes, charges, assessments and any other government charges, surcharges and levies, general and special, ordinary or extraordinary, including business license fees or charges (including interest thereon whenever same may be payable in installments) which Landlord shall pay or be obligated to pay arising out of the use, occupancy, management, repair or replacement of the Premises, any appurtenance thereto or any property, fixtures or equipment thereon.

    5.3 *Premises Insurance.* Tenant shall at all times during the Term of this Lease procure and maintain in full force and effect an All-Risk Premises Insurance Policy on the Premises, which shall include flood insurance if the Premises is in a flood zone, and on all improvements constructed thereon and any additions or alterations thereto or replacements thereof. Said policy shall contain a Replacement

Store # 588, 589, 781, 793-795, 797, 799

Cost Endorsement, insuring against perils therein specified, in an amount equal to not less than one hundred percent (100%) of the replacement cost of all improvements on the Premises, exclusive of foundation and excavation costs, the proceeds of which shall be payable to Landlord and any designated mortgagee in accordance with their respective interests therein. The cost of such insurance shall be billed to Tenant on a monthly basis, which shall be paid at the same time and by the same method as the monthly rent.

6. **USE OF PREMISES AND TECHNOLOGY.**

6.1 *Use of Premises*. Tenant may use the Premises and the improvements thereon only for the operation of a gas station and convenience store for the sale of gasoline and other petroleum products and ancillary products associated therewith and normally found in a gas station convenience store and as otherwise permitted by this Lease including incidental products and food, but in all cases subject to the limitations set forth in this Lease and in all cases subject to and in compliance with all local, state and federal laws and regulations. Tenant shall be responsible for obtaining and keeping valid and active all licenses and permits necessary and proper for and associated with said uses. Tenant shall not encumber the Premises or otherwise enter into any service or supply agreements which, by their terms, seek to encumber the Premises or exceed or extend beyond the scope of the uses granted or the time periods provided by this Lease without the prior express written permission of Landlord. Tenant shall not enter into any agreements related to or directly for the provision of internet or network connectivity or support services or financial services on or at the Premises without the express prior written consent of Landlord. The Premises shall not be used by Tenant for any purpose not expressly provided herein unless Landlord agrees in writing to such additional use. The Premises shall not be used for any illegal purpose, or in any manner so as to create any nuisance or trespass, or in any manner to vitiate the insurance or increase the rate of insurance on the Premises. Tenant shall not commit or allow any waste or nuisance upon the leased Premises, and shall maintain the Premises in a clean, neat, orderly, and attractive condition.

6.2 *Use of Technology*. Dealer shall use such electronic software reporting systems for conducting market surveys, electronic measurement, tracking, and reporting of fuel and merchandise inventory levels, and recording and reporting of fuel and merchandise sales and all other sales conducted at the Locations as directed by Supplier; current systems may include, but are not limited to, Black Box, Opis, JBOX, Wireless Guardian, and Price Advantage technology ("Reporting Systems"). Dealer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Dealer's account, and Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

7. **OPERATION OF THE PREMISES.** During the Term of the Lease, Tenant shall:

(a) keep the Premises, buildings, equipment, fixtures, rest rooms, sidewalks, approaches, and driveways in good condition, properly lighted, clean, safe, sanitary, and free of trash, rubbish, and other debris;

Store # 588, 589, 781, 793-795, 797, 799

     (b)   keep the approaches, driveways, and service areas uncluttered and free of parked vehicles, trailers, and other obstructions, including ice and snow, at all times;

     (c)   not engage in or permit any improper act or conduct on the Premises detrimental to Tenant, Landlord, or any member of the public; and

     (d)   comply with all laws, ordinances, rules, or regulations of constituted public authority applicable to the use and occupancy of the Premises, use of the equipment and the conduct of the business.

**8.**     **MOTOR FUEL SUPPLY, REPORTING AND OTHER AGREEMENTS.**

8.1    Commensurate with the execution and commencement of this Agreement, Tenant has entered into a motor fuel supply agreement (the "Fuel Supply Agreement") of even date herewith and with an affiliated entity of Landlord. Tenant hereby agrees that is must comply with all terms and conditions set forth in such Fuel Supply Agreement, including without limitation, compliance with OPIS. In the event the Landlord chooses to enter into a supply agreement for the delivery of motor fuels to the Premises (whether or not such agreement covers other properties owned or managed by Landlord) (the "Transport Agreement"), Tenant must also enter into and comply with all the terms and conditions set forth in such Transport Agreement, and Landlord reserves the right to negotiate any such Transport Agreement and to receive payments under any such Transport Agreement. Tenant's failure to meet any minimum monthly or annual petroleum sale requirements applicable to Tenant as set forth in the Fuel Supply Agreement or by the Landlord shall constitute a default hereunder. Upon said default, the Landlord may, upon ten (10) days prior written notice, terminate this Lease and regain possession of the Leased Premises, by self-help or otherwise. Tenant shall provide, in addition to the gross sales reports required to be provided to and/or made available for inspection by Landlord pursuant to this Lease, all records and information as Landlord may request from time to time relating to Tenant's retail sale of motor fuels and amounts of motor fuels dispensed at the Leased Premises during the Term. Landlord to be responsible for and control fuel island and all equipment related thereto including UST and system.

8.2    Financial Reporting/Auditing. During the Term of this Agreement, all operating revenue and expenses incurred in association with the operation of the businesses at the Premises shall be calculated (in accordance with Landlord's audit standards) by Tenant and reported to Landlord on a monthly basis and no later than the fifteenth (15th) day following the end of the calendar month as otherwise provided below. Landlord shall have the right, from time to time, to cause its accountants, auditors and/or representatives to inspect and audit the financial books and records of Tenant with respect to the business operations at the Premises. During the Term hereof, Tenant shall fully and promptly pay for all operating expenses of the businesses at the Premises including, without limitation, all vendors, suppliers, support services, water, sewer, gas, heat, light, power, telephone, internet and related services and all other public and private utilities of every kind furnished to the Premises or used by Tenant in association therewith during the Term. Tenant shall cooperate with Landlord in maintaining records and reporting financial results hereunder and shall cause its accountants and auditors to maintain accurate records of and provide Landlord with a written accounting of all operating revenue and operating expenses on at least a monthly basis during the Term. Landlord shall provide Tenant with a basic back-

office data system with current price book data to commence operations at each Premises location.

9.  **ABANDONMENT OF LEASED PREMISES.**  Tenant agrees not to abandon or vacate the leased Premises during the period of this Lease and agrees to use said Premises only for purposes granted herein until the expiration or termination hereof.  None of the equipment owned by Landlord, including as may be provided for in an accompanying equipment lease, shall be removed from the Premises.

10. **REPAIRS AND MAINTENANCE.**

10.1  *Repairs and Maintenance by Tenant.* Landlord gives to Tenant exclusive control of the Premises (exclusive of the fuel islands) and shall be under no obligation to inspect said Premises. Tenant acknowledges that Tenant has had the right to inspect the Premises, including all equipment located thereon, and Tenant accepts the same in their present condition as suited for the intended use by Tenant "AS IS, WITHOUT WARRANTY."  During the Term, Tenant shall, at Tenant's sole cost and expense, maintain in good order and repair the leased Premises, and all equipment, fixtures and other improvements located upon the Premises.  Tenant further agrees to care for the grounds around the building, including the mowing of grass, care of shrubs, and general landscaping. Additionally, Tenant shall be responsible for repairs to the roof, foundation, exterior walls, underground utility and sewer pipes. Tenant agrees to return the Premises and all equipment, fixtures, and other improvements to Landlord, at the expiration or prior to the termination of this Lease, in as good condition and repair as when first received, natural wear and tear and acts of God excepted.  Tenant understands that Tenant is responsible for any replacement and upgrade to any equipment upon the Premises and any related costs and/or expenses shall be borne by Tenant.

10.2  *Repairs and Maintenance by Landlord.*  It is acknowledged that the intent of this paragraph is for the Landlord to have **no** duty to repair or maintain any portion of the Premises, equipment, fixtures, or other improvements located thereon whatsoever except as otherwise provided herein.  Notwithstanding anything to the contrary herein, Landlord agrees to reimburse Tenant for the repair or replacement of any of the laundry equipment (washers, dryers and related systems) currently located at each of the Premises locations as necessary to bring same into good working order in accordance with laundromat industry standards and quality.  Thereafter, Tenant shall be fully responsible for maintaining and repairing or replacing such equipment as necessary during the Term and as provided herein.

10.3  *Environmental Management and Inspection Fees.* Landlord shall keep in good repair each underground gasoline storage tank ("UST") and underground fuel lines, except repairs rendered necessary by the acts or omissions of Tenant, its agents, employees and invitees.  Tenant shall also reimburse Landlord for its monthly environmental management consulting fees incurred by Landlord during the term and any extended term of this lease.  Landlord shall select an environmental firm of its choosing, and nothing contained herein shall be deemed to prohibit Landlord from selecting any other qualified environmental management company to perform environmental management services for Landlord in regard to the Premises, at a cost that is usual and customary in the industry.  Landlord shall be

Store # 588, 589, 781, 793-795, 797, 799

under no obligation to inspect said Premises. Tenant shall promptly report in writing to Landlord any defective condition known to it which Landlord is required to repair, and failure to so report such defects shall make Tenant responsible to Landlord for any liability incurred by Landlord by reason of such defects. Tenant agrees to engage indemnify, defend, and hold Landlord harmless from all clean-up costs, personal injury, death or property damage claims, and fines or penalties which arise out of or are related to the leakage of petroleum products during the Term of the Lease but not for any matters arising before the inception hereof. Further, if applicable, Tenant agrees to participate in the applicable state's Petroleum Storage Tank Trust Fund and take all actions necessary to maintain eligibility thereunder. Tenant shall be liable for the deductible under the applicable state's Storage Tank Trust Fund should a release occur, unless such release is caused by the failure of Landlord to keep the underground gasoline storage tanks and underground fuel lines in good repair, as provided herein.

      10.4    *Record Keeping*. Tenant agrees to provide to Landlord upon demand, or at a minimum, at least annually, copies of all leak detection or other compliance records. Tenant shall maintain such records for a minimum of three (3) years.

    **11.**    **ENVIRONMENTAL/SOIL COMPLIANCE.** Tenant shall comply with all environmental laws, rules and regulations pertaining to operation of the business on the Premises including all of the requirements pertaining to leak detection and other regulatory compliance issues associated with the use of the underground storage tanks.

    **12.**    **DESTRUCTION OF OR DAMAGE TO PREMISES.** If Premises are totally destroyed by storm, fire, lightning, earthquake, or other casualty, this Lease shall terminate.

    **13.**    **INDEMNIFICATION OF LANDLORD AGAINST LOSS OR CLAIM.** For and during the Term of this Lease, Tenant shall protect, indemnify, defend, and save harmless Landlord from and against all claims, demands, liability, losses, or costs, whether from injury to persons or loss of life or damage to property occurring on or within the Premises and arising in any manner, directly or indirectly, out of the use and occupancy of the Premises by Tenant. Tenant shall, at Tenant's expense, provide and keep in force for the benefit of Landlord comprehensive general liability insurance covering the Premises and the business to be operated thereon, in which insurance policy or policies Landlord, as well as Tenant, shall be named as an insured. The said policy or policies of insurance shall provide for limits of liability for bodily injury of not less than $1,000,000.00 single limit coverage for each accident or occurrence, and not less than $250,000.00 for property damage. Said policy shall include any "dram shop" or liquor liability coverage in the event Tenant sells alcoholic beverages at the Premises. Tenant shall furnish to Landlord evidence of such insurance within fifteen (15) days of the date hereof and at such other times as Landlord may require. Tenant shall defend, indemnify, and save harmless Landlord from and against all claims, demands, liabilities, losses, or costs to which Landlord may be subjected for or by reason of any person, firm, or corporation seeking to hold or holding Landlord liable or in any way responsible for the debts or obligations incurred in any manner in connection with the conduct and operation of the business conducted on the Premises.

Store # 588, 589, 781, 793-795, 797, 799

14. **GOVERNMENTAL ORDERS.** Tenant agrees that, at Tenant's own expense, Tenant will promptly comply with all requirements of any legally constituted public authority made necessary by reason of Tenant's occupancy of said Premises.

15. **CONDEMNATION.** If the whole of the leased Premises, or such portion thereof as will make the Premises unusable for the purposes herein leased, shall be condemned by any legally constituted authority for any public use or purpose, then in either of said events, the Term hereby granted shall cease from the date when possession thereof is taken by public authorities, and rental shall be computed and paid as of said date. Each party may make a claim against the condemning authority for their respective interests in the property.

16. **ASSIGNMENT, SUBLETTING AND CHANGE OF CONTROL.** Tenant shall not assign or sublet this Lease or any interest hereunder, or sublet the Premises or any part thereof, or permit the use of the Premises by any party other than Tenant without the prior written consent of Landlord. No such assignment or sublease shall have the effect of releasing Tenant from this Lease. For each request for assignment or sublease by Tenant that is approved by Landlord, Tenant agrees to be responsible for and reimburse Landlord for it's attorney's fees associated with the review, approval and documentation thereof. Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Premises in entering into this Lease. Without the prior written consent of Landlord: (i) no direct or indirect Transfer of an interest in Tenant (whether by stock, partnership interest or otherwise, voluntarily or by operation of law) shall occur; (ii) no direct or indirect interest in Tenant shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of Tenant; and (iii) no change of Control of Tenant shall occur (each of items (i) through (iii) are hereinafter referred to as a "Transfer"). As used herein and for purposes hereof, the term "Control" shall mean with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to a publicly traded company.

17. **DEFAULT.** It is mutually agreed that in the event Tenant (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Tenant violates or is in default of any other agreements between Landlord and Tenant; Landlord, at its option, may provide ten (10) days' notice of said default and the right to cure said event of default, and if Tenant has not cured said default within said period, Landlord may:

    (a) terminate this Lease by written notice to Tenant whereupon this Lease shall terminate immediately, and possession of the Premises shall immediately be returned to Landlord;

    (b) not terminate this Lease and enter the Premises and take possession thereof and relet the

Store # 588, 589, 781, 793-795, 797, 799

Premises or any portion thereof on such terms as Landlord deems appropriate. Any rent from any reletting shall be applied to any indebtedness other than rent owing to Landlord, second to Landlord's attorney's fees and brokerage fees and other expenses of exercising its rights, and third, to the rent due. Tenant agrees to pay any deficiency within ten (10) days of demand by Landlord therefor; or

(c) pursue separately or concurrently, any and all other remedies allowed by law or in equity.

Any notice provided in this paragraph may be given by Landlord or its attorney. Upon Lease termination by Landlord, Tenant will at once surrender possession of the Premises to Landlord and remove all of Tenant's effects therefrom; and Landlord may forthwith re-enter the Premises and repossess itself thereof, and remove all persons and effects therefrom, using such force as may be necessary without being guilty of trespass, forcible entry, detainer, or other tort. If Tenant refuses to surrender possession immediately, Landlord may institute appropriate legal proceedings and Tenant agrees that Landlord may obtain injunctive relief for removal of Tenant, should Tenant's leasehold become subject to cancellation hereunder.

It is expressly agreed that no termination of this Lease as the result of Tenant's default or breach shall have the effect of releasing Tenant from his obligation to pay the full Base Rent due for the entire period of the then existing Term.

18. **SIGNS.** Tenant shall not install, paint, display, inscribe, place, or affix any sign, picture, advertisement, notice, lettering, or direction ("Signs") on the exterior of the Premises, the common areas of the building upon the Premises, the interior surface of glass and any other location which could be visible from outside of the Premises without first securing written consent from Landlord therefor. Any Signs permitted by Landlord shall, at all times, conform with all municipal ordinances or other laws, rules, regulations, deed restrictions, and protective covenants applicable thereto. Tenant shall remove all Signs at the expiration or other termination of this Lease, at Tenant's sole risk and expense, and shall in a good and workman-like manner properly repair any damage caused by the installation, existence, or removal of Tenant's Signs.

19. **QUIET ENJOYMENT**. So long as Tenant complies with all provisions hereof, Tenant shall have quiet enjoyment of the Premises.

20. **EFFECT OF TERMINATION OF LEASE.** No termination of this Lease prior to the normal ending thereof, by lapse of time or otherwise, shall affect Landlord's right to collect rent for the full term.

21. **MORTGAGEE'S RIGHTS.** Tenant's rights shall be subject to any bona fide mortgage or deed to secure debt, which is now, or may hereafter be, placed upon the Premises by Landlord. Tenant agrees to cooperate with Landlord's efforts to finance or refinance the Premises and to sign or consent to any such financing arrangements, including providing estoppel certificates and any other instrument reasonably required. Further, Tenant shall provide financial income statements for the Premises to Landlord, showing the sales, profits and losses, assets and liabilities pertaining to the Premises. Such

Store # 588, 589, 781, 793-795, 797, 799

financial records shall be provided within thirty (30) days after the end of each fiscal quarter and within one hundred (100) days after the end of each fiscal year.

22. **NO ESTATE IN LAND.** Except as otherwise provided herein, this contract shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord. Tenant's interest in the Premises is possessory only, and personal to Tenant, and is not subject to levy or sale, nor assignable by Tenant except by Landlord's prior written consent.

23. **HOLDING OVER.** If Tenant remains in possession of the Premises after expiration of the Term hereof, with or without Landlord's acquiescence and without any express agreement of the parties, Tenant shall be a Tenant at will at 150% the rental rate in effect at the end of the Lease. There shall be no renewal of this Lease by operation of law.

24. **ATTORNEY'S FEES AND HOMESTEAD.** Should Landlord retain counsel for the purpose of enforcing, or preventing the breach of, any provision hereof, including the institution of any action or proceeding, to enforce any provision hereof or for damages for any alleged breach of any provision hereof, or for a declaration of such party's rights or obligations hereunder, then, whether such matter is settled by negotiation, or judicial determination, the Landlord shall be entitled to be reimbursed by Tenant for all costs and expenses incurred, including reasonable attorneys' fees. Tenant waives all homestead rights and exemptions which it may have under any law against any obligations owing under this Lease. Tenant hereby assigns to Landlord its homestead and exemption.

25. **SERVICE OF NOTICE.** Any notices to Tenant required under this Lease, shall be sent by certified mail, overnight delivery to the address first written above or by electronically verifiable means to such email address as provided by Tenant.

26. **TIME OF ESSENCE.** Time is of the essence of this Lease.

27. **RIGHTS CUMULATIVE.** All rights, powers, and privileges conferred hereunder upon parties hereto shall be cumulative, including those rights given by law.

28. **NO WAIVER OF RIGHTS.** All rights, powers, and privileges conferred hereunder upon parties hereto shall be cumulative, including those rights given by law. No failure of Landlord to exercise any power given Landlord hereunder, or to insist upon strict compliance by Tenant with its obligation hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's right to demand exact compliance with the terms hereof.

29. **LEGALITY OF AGREEMENT.** In the event any portion or portions of this Lease are declared unconstitutional, illegal, void, or of no force and effect, the balance of this Lease shall remain in full force and effect and enforceable as a binding contract.

30. **TERMS INCLUSIVE.** "Landlord" as used in this Lease shall include Landlord, its assigns, and successors. "Tenant" shall include Tenant, his heirs, and representatives, and if this Lease shall be validly

Store # 588, 589, 781, 793-795, 797, 799

assigned or sublet, shall also include Tenant's assignees or sublessees, as to such assignment or sublease. "Landlord" and "Tenant" include male and female, singular and plural, and shall also include any corporation, partnership, or individual, as may fit the particular parties.

**31. LICENSES AND PERMITS.** During the Term, Tenant shall be responsible to obtain and maintain, at Tenant's sole cost and expense, Tenant's own licenses and/or permits required to operate such a business upon the Premises, including, but not limited to any necessary beer/wine, liquor and lotto licenses. Tenant agrees to acquire from the appropriate authorities, and agrees to maintain, any required and/or necessary permits, licenses and/or qualifications, prior to:

(a) operating Tenant's business upon the Premises; and/or

(b) making any improvement, modification or other change to the Premises (said improvement, modification or change may require the prior written consent of Landlord). Tenant shall be responsible for all obligations, claims, and debts of the business upon the Premises arising during the Term. Tenant agrees to indemnify and hold Landlord harmless from all losses, claims, damages, or assessments, including attorney fees and costs, incurred by Tenant or the business operated upon the Premises, for any citation/violation of any permit or license.

**32. ENTIRE AGREEMENT.** This document contains the entire agreement between the parties hereto, supercedes or replaces any and all other prior agreements by, between, or among the parties hereto and no representations, inducements, promises, or agreements, oral or otherwise, between the parties, not embodied herein, shall be of any force or effect.

**33. ELECTRONIC TRANSMISSION AND SIGNATURE.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(a) "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(b) "Electronic Signature" has the meaning provided in the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq.

**34. ALTERATIONS.** Tenant shall not make any alterations, additions, or improvements to the Premises without Landlord's prior written consent. Tenant shall promptly remove any alterations, additions, or improvements constructed in violation of this paragraph upon Landlord's written request.

Store # 588, 589, 781, 793-795, 797, 799

All approved alterations, additions, and improvements will be accomplished in a good and workmanlike manner, in conformity with all applicable laws and regulations, and by a contractor approved by Landlord, free from any liens or encumbrances. Landlord may require Tenant to remove any alterations, additions or improvements (whether or not made with Landlord's consent) at the termination of this Lease and to restore the Premises to its prior condition, all at Tenant's expense. All alterations, additions and improvements which Landlord has not required Tenant to remove shall become Landlord's property and shall be surrendered to Landlord upon the termination of this Lease, except that Tenant may remove any of Tenant's machinery or equipment which can be removed without material damage to the Premises. Tenant shall repair, at Tenant's expense, any damage to the Premises caused by the removal of any such machinery or equipment.

35. **ADDITIONAL PROVISIONS.**

35.1 *Acknowledgement of Risks.* Without limiting the other terms and conditions of this Lease, Tenant specifically acknowledges and further agrees that:

(a) There are inherent risks in the operation of a business at the Premises and Tenant is willing and able to bear such risks, including, without limitation, the loss of any investment in the Premises or such business upon termination of this Lease;

(b) upon termination of this Lease for any reason, Landlord shall have the right to use the Premises as it deems appropriate, including, but not limited to selling the Premises, operating a similar or other business upon the Premises, converting the Premises to any other use Landlord deems appropriate or leasing the Premises to a new lessee;

(c) Landlord has no obligation to lease the Premises to any new lessee, whether or not prospective lessee is willing to purchase Tenant's inventory, trade fixtures, or equipment;

(d) Any improvements, fixtures or equipment are not or cannot be removed in accordance with the provisions of the Lease shall become the sole and entire property of Landlord upon termination of this Lease;

(e) Landlord has no obligation to reimburse Tenant for any losses which Tenant might suffer in the operation of Tenant's business at the Premises or due to the termination of this Lease; and

(f) Landlord has no obligation to purchase any of Tenant's inventory, equipment or trade fixtures, or to reimburse Tenant for any sums invested by Tenant to improve the Premises or the business operated by Tenant on the Premises; provided, however, should this Lease be terminated prior to the end of any Term hereof, Landlord agrees to purchase the merchandise inventory held in the store on the Premises for resale to the public.

35.2 *Personalty Removed Upon Lease Termination.* At the termination or expiration of the Lease Term, Tenant shall surrender the Demised Premises on the same condition as it was in upon

Store # 588, 589, 781, 793-795, 797, 799

delivery or possession thereto under this Lease, reasonable wear and tear excepted, and shall deliver all keys to locks to Landlord. Before surrendering the Demised Premises, Tenant shall remove prior to the expiration of the Lease Term, all its personal property, trade fixtures, alterations, additions and decorations and shall promptly repair any damage caused thereby. Tenant's obligations to perform under this provision shall survive the expiration of the Lease Term. If Tenant fails to remove its property upon the termination or expiration of the Term, such property shall be deemed abandoned and shall become the property of Landlord.

35.3    *Background Check.*  This Lease is contingent upon Tenant passing a background check.

**36.**    **CROSS-DEFAULTS**. Any default by Tenant under the terms of this Lease shall likewise constitute a default of Tenant, as customer, Tenant, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other leases, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Premises, or other Premises or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Landlord's affiliated entities and related parties including, but not limited to, Mountain Express Oil Company, a Georgia corporation and its subsidiaries.  In the event Tenant is a tenant of a third-party landlord at the Premises, and Landlord has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Tenant hereunder shall likewise constitute a default under the terms of the lease between Tenant and such landlord and a default under the lease shall be a default under this Lease.

*[signature page to follow]*

Store # 588, 589, 781, 793-795, 797, 799

**IN WITNESS WHEREOF**, the parties have hereunto placed their hands on the day and year first written above.

**LANDLORD:**

**MEX RE-SW-TX LLC,**

a Wyoming limited liability company

By: **MOUNTAIN EXPRESS OIL COMPANY,**

a Georgia corporation, its Manager

By: _____
Turjo Wadud, CEO

Date: 4/12/2023

**TENANT:**

**FOX FUELS RETAIL GROUP, LLC**

By: _____
Amit Soniminde, Manager

**ATL HOLDINGS LLC**

By: _____
Amit Soniminde, Manager

_____
Amit Soniminde, Individually

Date: 4/10/2023

Store # 588, 589, 781, 793-795, 797, 799

**Exhibit A**

Base Rent Allocations per Premises Location

| Store Name | Street Address | City | State | Annual Rent | Monthly Rent |
|---|---|---|---|---|---|
| 0202 (03) - Fox Marvin Love (MEX 3053) | 3603 Marvin D Love FWY | Dallas | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0204 (03) - Fox S Beltline (MEX 3055) | 4290 South Beltline Rd | Balch Springs | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0205 (03) - Fox Murdock (MEX 3056) | 180 Murdock Rd | Dallas | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0201 (03) - Fox Pioneer (MEX 3052) | 4243 W Pioneer Dr | Irving | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0203 (03) - Fox Harry Hines (MEX 3054) | 10110 Harry Hines blvd | Dallas | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0206 (03) - Fox Lake June (MEX 3057) | 8620 Lake June rd | Dallas | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0207 (03) - Fox South Buckner (MEX 3058) | 5001 South Buckner blvd | Dallas | TX | $225,000.00 NNN | $18,750.00 NNN |
| 0208 (03) - Fox Hwy 30 (MEX 3059) | 2600 East Highway 30 | Mesquite | TX | $225,000.00 NNN | $18,750.00 NNN |
| | | | | $1,800,000.00 NNN | $150,000.00 NNN |

Store # 588, 589, 781, 793-795, 797, 799