

EXHIBIT B

**AMENDED AND RESTATED FUEL SUPPLY AGREEMENT**

**THIS AMENDED AND RESTATED FUEL SUPPLY AGREEMENT** ("Agreement") is made the date the last party executes this Agreement ("Effective Date") by and between **MEX FUELS SW-TX LLC**, a Wyoming limited liability company, having a mailing address of 3650 Mansell Rd, Suite 250, Alpharetta, Georgia, 30022 ("Supplier"), **FOX FUELS RETAIL GROUP, LLC,** a Texas limited liability company, **ATL HOLDINGS LLC**, a Wyoming limited liability company, and **AMIT SONIMINDE**, an individual resident of the State of Georgia, having a mailing address of Box 408, Suite 6, 1000 Peachtree Industrial Blvd., Suwanee, Georgia 30024 (collectively, "Dealer").

**WHEREAS**, this Agreement is for the fueling station known as Mountain Express Stores located at the following addresses, as more particularly described on **Schedule 1** herein attached and incorporated (collectively, "Locations," each a "Location"):

| | |
|---|---|
| #588 | 4243 W. Pioneer Drive, Irving, Texas 75061 |
| #589 | 3603 Marvin D Love FWY Dallas Texas 75224 |
| #781 | 110110 Harry Hines Blvd. Dallas Texas 75220 |
| #793 | 4290 South Beltline Road, Balch Springs, Texas 75181 |
| #794 | 180 Murdock Road, Dallas, Texas 75217 |
| #795 | 8620 Lake June Road, Dallas, Texas 75217 |
| #797 | 5001 South Buckner Blvd., Dallas, Texas 75217 |
| #799 | 2600 East Highway 30, Mesquite, Texas 75225 |

**WHEREAS**, the parties desire to enter into an agreement for Supplier to supply motor fuels to Dealer at such Location.

**NOW THEREFORE**, in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Dealer agrees to buy, petroleum and other products on the following terms and conditions:

**1. TERM.** The Term of this Agreement shall begin on April 7, 2023 and continue for six (6) months ("Term"), and shall automatically renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least ninety (90) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided.  Any option to extend shall be provided for on **Schedule 2**. This Agreement is expressly contingent upon the termination of any

existing fuel supply agreements in place at the Location.

**2. SUPPLY OF PRODUCTS.** Supplier is in control of the fuel supplied at the Location. Dealer covenants and agrees to offer for sale at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 3** for the full duration of the stated term of this Agreement.

Until the Location can be converted to MEX 100% fuel and Supplier controls the fuel at the Location, Dealer agrees to purchase and sell fuel at the Location on a wholesale basis. During that time, Dealer shall be on three (3) day fuel payment terms with credit cards settled weekly. Upon the conversion of the Location from wholesale to MEX 100% fuel, Supplier agrees to reimburse Dealer for the remaining fuel inventory at the previous day's cost.

**3. OPERATION OF STATION.** Dealer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain that association. Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel Dealers as are customarily provided by convenience store/filling stations.

Dealer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) opening no later than 6:00am EST and closing no earlier than 11:00pm EST daily.

Dealer agrees to provide, at its sole cost and expense:

(a) broadband service to the Location in a manner acceptable to Supplier; and

(b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement. In the event that Dealer does not provide a survey, Supplier may charge Dealer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS**. Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement. Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier. Dealer affirmatively represents unto Supplier that Dealer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted Dealer in breaching the terms of any agreement with another motor fuel supplier.

**5. PRICE OF PRODUCTS TO DEALER AND RETAIL PRICING.** The retail pricing of motor fuels at the Location, shall be set by Supplier based upon market conditions and such other factors as may be deemed appropriate by

Supplier, and in the exercise of Supplier's sole discretion. Supplier shall notify Dealer, by telephone, fax transmission, e-mail transmission, electronic transmission, or other expeditious means of any price changes to be made for the retail pricing of motor fuels at the Location. Dealer shall cause the pricing changes to be made within one hour of such notification.

**6. CREDIT CARD NETWORK AND SALES.** Dealer shall use and Supplier shall be responsible for all costs associated with such use of credit card network and sales, including but not limited to, connection, processing, and equipment fees during the term of this Agreement, and only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier, which shall be maintained and upgraded by Supplier at its cost.

(a) No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise. In the event that Dealer uses a separate EBT machine, Dealer shall be required to use a network or machine supplied by an state agency approved vendor. In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement. In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500.00) cure fee for the first such default; and a one thousand dollar ($1,000.00) cure fee for any subsequent default during the Term hereof. In the event of default by Dealer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.

(b) Invoices from credit card sales for store inventory shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer of store inventory at the Location. Daily, Supplier shall provide a credit card settlement paid by check, EFT, or other agreed upon means, to Dealer. This settlement shall be for the net amount of credit card funds for store inventory held on behalf of Dealer as of the last twenty-four (24) hours, which shall be netted against any currently owing but unpaid invoices. This settlement shall not be assignable upon assignment or transfer of this Agreement without the express written consent of Supplier. Supplier reserves the right to revert back to the former credit card settlement terms at any time.

In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $400.00 for each such dishonored instrument or transfer. In the event of a bounced ACH draft, Dealer shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Supplier. Provided further, in the event of the return or dishonor of any draft or electronic fund transfer, or in the event Supplier has reasonable grounds upon which to believe that Dealer will not pay for fuel previously delivered to the Location in accordance herewith, then in either event, Supplier shall have the right to cause the removal (pump-out) of the in-ground fuel previously delivered to and stored upon the Location

and to credit Dealer's account for such fuel in an amount equal to the price of products that Dealer owes for the delivery of such fuel removed, less the cost of the pump-out.  Provided further, upon any such return or dishonor of any draft or electronic fund transfer and prior to causing the removal of in-ground fuel as heretofore provided, Supplier shall have the right to enter upon the Location and cause an electronic or manual cut-off or disabling of the fuel dispensing equipment so that no in- ground fuel can be pumped until the pump-out is completed or until the fund transfer is honored, whichever occurs first.

**8.   USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.**
Dealer shall use such electronic software reporting systems for conducting market surveys, electronic measurement, tracking, and reporting of fuel and merchandise inventory levels, and recording and reporting of fuel and merchandise sales and all other sales conducted at the Locations as directed by Supplier; current systems may include, but are not limited to, Black Box, Opis, JBOX, Wireless Guardian, and Price Advantage technology ("Reporting Systems").  Supplier shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems.

Dealer shall, prior to 10:00 a.m. EST each day, transmit by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a daily report of the sales of motor fuels during the prior business day. Such transmission shall be upon the format provided by Supplier. Additionally, Dealer shall, by 12:00 Noon EST each day, transmit to Supplier, by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a copy of all deposit slips validated by the depository bank, for the prior day's motor fuel sales. Supplier reserves the right to designate an alternative data transmission mode for compliance herewith.

In the event Dealer fails to transmit daily sales reports and/or copies of deposit slips in a timely manner, as aforesaid, Dealer shall pay unto Supplier the sum of $100.00 for the first such failure; $300.00 for the second such failure and $500.00 for each and every such subsequent failure, in which such transmissions are late. Further, in the event Dealer fails to timely transmit sales reports and/or copies of deposit slips, as aforesaid, on three occasions, Supplier shall have the right to immediately terminate this Agreement and avail itself of all of Supplier's remedies upon termination as provided for herein.

Dealer shall record and maintain accurate sales and inventory records for the sale of motor fuels at each pump upon a daily basis. Supplier shall provide Dealer with appropriate banking information and other documentation for Supplier to either draft or deposit funds as may be necessary.  In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $400.00 for each such dishonored instrument or transfer.  In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

**9. DEALER'S BUSINESS.** It is mutually agreed that the business conducted by Dealer at the Location is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Dealer at the Location and Dealer has not relied upon any business information provided by Supplier in regard thereto; and Dealer enters into this Agreement based upon the exercise of Dealer's own business judgment after having full opportunity to exercise due diligence on Dealer's own behalf.  Dealer acknowledges its sole resposibility for: (1) pricing of all the products sold in the convenience store at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards. Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the Dealer's business.

Dealer affirmatively represents and warrants unto Supplier that Dealer is not under contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Dealer to breach, nor has Supplier interfered with, any other existing contract between Dealer and any other product supplier. In the event Dealer is a corporation or limited liability company, Dealer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State where the location is situated, and that the undersigned party executing this Agreement on behalf of Dealer has full and complete authority to bind the corporation or limited liability company hereto. Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Dealer under the terms of this Agreement.

**10. UNDERGROUND STORAGE TANKS AND MAINTENANCE**.  Dealer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location. Supplier shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades). Dealer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Dealer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Supplier's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.  Dealer warrants that throughout the entire Term of this Agreement, Dealer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling, and dispersing of petroleum products and motor fuels. Further, Dealer shall comply with all directions, instructions, or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.  Supplier shall pay such premiums as may be necessary to

have the storage tanks and pumping equipment covered under private underground storage tank insurance, at its election, all of which shall be paid by Supplier.

Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Dealer and terminate this Agreement. Without limiting the foregoing, Supplier shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished, or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.  Supplier shall pay the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings.

In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law.

**11. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT**. Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 4** attached hereto and made part hereof. Dealer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement.  At all times relevant hereto, the Supplier shall be the sole and exclusive owner of such equipment listed on Schedule 4, with the full right and authorization of Dealer to remove same upon a default under Section 19 hereof which remains uncured for more than thirty (30) days of written notice of default hereunder.  Dealer hereby grants to Supplier a power of attorney coupled with an interest, for the purpose of removing the said equipment from the location upon an uncured default and Supplier shall have no liability whatsoever for removal of the equipment after notice and cure period.

**12.  RESERVED.**

**13.  RESERVED.**

**14.  BRANDING, TRADEMARKS, AND QUALITY ASSURANCE.**

(a) *MOTOR FUEL BRAND &TRADEMARKS*. Supplier shall have the right to designate the branding of the motor fuels to be sold at the Location. The initial branding, if any, shall be as designated on **Schedule 6** attached

Store #588,589,781,793-7965,797,799                    MEX 100% Fuel

hereto and made part hereof. Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location (said sum hereinafter being referred to as Supplier's Branding Investment), in order to obtain the approval of Supplier's chosen branded fuel supplier. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance.

(b) *QUALITY ASSURANCE AND MARKETING.* Dealer acknowledges that Supplier's supplier maintains a program for product quality and marketing assurances. Specifically, Dealer shall:

(i) Comply with all quality and marketing programs, which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, proper maintenance of landscaping, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such matters pertaining to the brand image of the Location, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections;

(ii) Refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location; and

(ii) Dealer shall properly display all point of purchase marketing materials and credit card applications, and, at participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location, install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials and attend any training or informational programs offered.

It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting the image, retail and Dealer service standards required under the terms of this Agreement. In the event Dealer scores below 80% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Dealer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Dealer

receiving notice of such failure and a copy of the inspection report. The foregoing inspection fee shall apply to each and any failure of such inspections; provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Dealer's exercise of good faith in promptly correcting all quality assurance deficiencies. Dealer shall also be subject to certain fines as provided for on the attached Fine Schedule as provided for on **Schedule 7** herein attached an incorporated for violations which may not result in a failing score. In the event Dealer fails a mystery shopper inspection or other inspection at the Location, Supplier reserves the right to implement a monthly maintenance program at the Location and choose a vendor to cure at its sole and absolute discretion.  The cost of said maintenance program shall be the responsibility of the Dealer, which shall be no more than the customary cost of said services in the local area of the Location.

In the event Dealer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Dealer, or if such retail facility is abandoned, Dealer shall allow Supplier or Supplier's representatives or  Dealers to immediately remove all brand identification from the Location, and Dealer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Dealer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Dealer will use only signs approved by Supplier to advertise products purchased by Dealer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors.

Provided further, in the event Supplier determines, in its sole discretion, that Dealer is not in compliance with any marketing or quality assurance retailing standard in regard to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation) to enter upon the Location and to correct any deficiency or substandard condition and bill Dealer for the cost thereof. Dealer shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill. Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier. Further, without limiting the foregoing, Dealer shall comply with the image and identification standards established, from time to time, for "branded outlets" by Supplier's branded supplier.

**15. RESERVED.**

**16.  SECURITY DEPOSIT**. Dealer shall pay unto Supplier a security deposit upon the execution of this Agreement in an amount and in the manner as specified on **Schedule 8** hereto attached an made part hereof. During the term of this Agreement, Suppler shall have the right to apply all or part of said deposit to any sums owed by Dealer to Supplier under the terms hereof. In such event, Supplier shall notify Dealer of such application and

Dealer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit. Supplier's application of all or any portion of the security deposit shall not relieve Dealer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Dealer's default under the terms of this Agreement. Further, Dealer hereby grants Supplier a security interest in all of Dealer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**17. ASSIGNMENT-SUBLETTING-SALE**.  Dealer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Dealer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Dealer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee.  If approved, Dealer shall remit funds in the amount of $2,000.00 for legal and administrative fees. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier.  An assignee of Dealer, at option of Supplier, shall become directly liable to Supplier for all obligations of Dealer hereunder, but no assignment by Dealer shall relieve Dealer of any liability hereunder, and Dealer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Dealer's obligations under the terms of this Agreement. Dealer shall have the right, without prior written consent of Supplier, to form a corporation or limited liability company organized under the laws of the state of the Location,  and wholly owned by Dealer, and may assign or tranfer this Agreement to such company with notice provided to Supplier however, any such assignment or transfer shall not relieve Dealer of joint and several liability for all of Dealer's obligations hereunder, the performance of which shall be personally guaranteed by Dealer.  This Agreement is freely assignable by Supplier and in the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Dealer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**18. LEGALITY, VALIDITY, AND ENFORCEABILITY OF AGREEMENT.**  In the event any portion or portions of this Agreement are declared unconstitutional, illegal, void, or of no force and effect, the balance of this Agreement shall remain in full force and effect and enforceable as a binding contract. Supplier and Dealer hereby acknowledge and agree that the validity and enforceability of this Agreement is expressly conditioned on and subject to the approval of the Special Transactions Committee (the "Committee") of the Board of Directors of Supplier's parent, Mountain Express Oil Company, and failure of the Committee to approve or its disapproval of this Agreement upon its presentation to the Committee for approval shall render this Agreement void and

of no force and effect.

**19. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES.**    All terms, conditions, covenants, warranties, and agreements contained in this Agreement are essential and material to the continued relationship between the parties. It is mutually agreed that in the event Dealer (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Dealer violates or is in default of any other agreements between Supplier and Dealer, Dealer shall be considered in default of the Agreement. In addition to the aforementioned, the following shall constitute events of breach or default:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this Agreement;

(b) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Dealer's operation of the business conducted pursuant to or in connection with this Agreement;

(c) false or misleading statements made by Dealer to Supplier, including financial statements made or provided by Dealer in order to enter into this Agreement;

(d)  failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion;

(e) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Dealer;

(f) failure of Dealer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Dealer's employment of any person;

(g) abandonment or cessation of operation of the business of Dealer;

(h) severe physical or mental disability of Dealer;

(i) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Dealer of trade mark requirements for products sold by Dealer as set forth under this Agreement;

(j) violation of any term or condition of the Agreement, any cash advance agreement or any other agreements between the parties related to the Location; or

(k) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq.

Store #588,589,781,793-7965,797,799          MEX 100% Fuel

Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Dealer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Dealer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period.  In the event Dealer receives written notice from Supplier of any events of default hereunder, Dealer specifically acknowledges and agrees that Supplier, through its Dealers, shall have the right to inspect Dealer's facility at the Location for purposes of determining compliance with this Agreement.  In the event such event is not cured within 15 days of notice thereof, Supplier shall be entitled to make any corrections and/or repairs necessary at the Dealer's expense.   Notwithstanding the foregoing, in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within five 5 days from the date of written notice to Dealer, then in such event Supplier shall have the right to then immediately terminate this Agreement.

The parties hereto agree and stipulate that in the event of default by Dealer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Dealer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Dealer and Supplier specifically acknowledge and agree that such damages upon Dealer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier.

**20. ATTORNEY'S FEES, COSTS, INTEREST.**   In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00.  In the event Dealer requests Supplier to execute documents changing or otherwise affecting Supplier's security interests hereunder, including but not limited to an Addendum to Jobber Agreement,  Supplier shall be entitled to charge and collect from Dealer administrative costs for handling said request in an amount not less than $2,000.00. In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

**21. MISCELLANEOUS.**

(a) *INSURANCE*. Dealer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Dealer shall maintain workers' compensation insurance as required to be in full compliance with the State's Workers Compensation Act and obtain Workers Compensation Insurance. Dealer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier. Additionally, Dealer shall reimburse Supplier, by EFT on a monthly basis, for any all

insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or Agreementd by Supplier and installed at the Location. In the event that Dealer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Dealer the actual cost of the insurance plus an administrative fee.

(b) *CONTINGENCIES*. This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Dealer, the branding image and specifications therefor, and Dealer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by Agreement or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Dealer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed and owned by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Upon any breach or default under Section 19 hereof, Supplier shall have the right to injunctive relief in the form of a restraining order against Dealer and/or Landlord preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement.Dealer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

(c) *SEVERABILITY*. (i) If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality or a failure of consideration in regards to the benefits and obligations set forth herein.  (ii) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, unless such amendment(s) shall operate to increase Supplier's taxes, costs or expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Dealer.

(d) *ENTIRETY-AGREEMENT*. This Agreement constitutes the entire agreement and understanding between Supplier and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Dealer. All prior agreements between Supplier and Dealer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall

be binding upon Supplier or Dealer unless in writing, duly executed by Dealer and a duly authorized  Dealer of Supplier.

(e) *ELECTRONIC TRANSMISSION AND SIGNATURE*.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i. "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

ii. "Electronic Signature" has the meaning provided in the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq.

(f) *NOTICES.* Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered, provided by verifiable elctrontic means or, if deposited in the United States mail by certified mail, return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received.  Dealer has an obligation to notify supplier if they move or otherwise change the address noted above.  In the event Dealer fails to notify Supplier of an address change, all mail sent by Supplier to Dealer's address shown above shall be deemed sufficient notice whether claimed or unclaimed.

(g) *CHOICE OF LAW.* This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

(h) *JOINT AND SEVERAL LIABILITY*. In the event more than one person, firm, company or entity are named as Dealer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Dealer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

(i) *CROSS-DEFAULTS*. Any default by Dealer under the terms of this Agreement shall likewise constitute a default of Dealer, as tenant, Dealer, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other Agreements, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other premises or locations or to the sale or purchase for resale of motor fuels or other products. This

provision shall also apply to any agreements with Supplier's affiliates and related parties, including but not limited to any Dealer defaults with any branded fuel supplier.  In the event Dealer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Dealer hereunder shall likewise constitute a default under the terms of the Agreement between Dealer and such landlord and a default under the Agreement shall be a default under this Agreement.

(j) *CREDIT CARD FRAUD SKIMMING.*   Supplier shall have the right to immediately charge back to the Dealer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Dealer is responsible for any credit card fraud which may occur at the Location including Skimming.  Skimming is the theft of credit card information.  This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal.  This device allows a thief to capture a Dealer's credit and debit card information, including their PIN, with each card swipe.  Dealer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming.  Dealer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

(k) *QUALITY AND CLAIMS.* Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives Supplier notice of such deficiency at time of delivery (or during the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Dealer shall immediately notify Supplier if its equipment is leaking. Dealer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Dealer against Supplier arising out of product defects, variances, or shortages.

**22.  TRANSFER.**   Dealer acknowledges that Supplier has relied both on the business experience and creditworthiness of Dealer and upon the particular purposes for which Dealer intends to use the Location in entering into this Agreement.  Without the prior written consent of Supplier: (i) no direct or indirect Transfer of an interest in Dealer (whether by stock, partnership interest or otherwise, voluntarily or by operation of law) shall occur except for any such Transfer to an Affiliate; (ii) no direct or indirect interest in Dealer shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of Dealer; and (iii) no change of Control of Dealer shall occur (each of items (i) through (iii) are hereinafter referred to as a "Transfer").  As used herein and for purposes hereof, (a) the term "Control" shall mean with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to a publicly traded company and (b) the term "Affiliate" shall mean a person or entity that directly or indirectly

through one or more intermediaries Controls, is Controlled by, or is under common Control with such person or entity.

**23.   INVENTORY.**   Upon the commencement of the Term and at the time of Location inventory audit, Dealer agrees to remit to Supplier the retail cost of the non-expired store inventory at the Location.

**24.  SPECIAL TRANSACTION COMMITTEE.** The validity and enforcement of this Agreement is expressly subject to the approval of the Special Transaction Committee of the Board of the Directors of Supplier's parent, Mountain Express oil Company.

*[signature page to follow]*

Store #588,589,781,793-7965,797,799           MEX 100% Fuel

**IN WITNESS WHEREOF**, the parties hereto have caused this Fuel Supply Agreement to be effective as of the Effective Date first written above.

**SUPPLIER**

**MEX FUELS SW-TX LLC**

a Wyoming limited liability company

By: Mountain Express Oil Company,

a Georgia corporation,

its Manager

By: _____

    Turjo Wadud, CEO

Date: _____ 4/12/2023

**DEALER**

**FOX FUELS RETAIL GROUP, LLC**

By: _____

    Amit Soniminde, Manager

**ATL HOLDINGS LLC**

_____

Amit Soniminde, Manager

_____

Amit Soniminde, Individually

Date: _____ 4/10/2023

**SCHEDULE 1 - PROPERTY DESCRIPTION**

#588    4243 W. Pioneer Drive, Irving, Texas 75061

#589    3603 Marvin D Love FWY Dallas Texas 75224

#781    110110 Harry Hines Blvd. Dallas Texas 75220

#793    4290 South Beltline Road, Balch Springs, Texas 75181

#794    180 Murdock Road, Dallas, Texas 75217

#795    8620 Lake June Road, Dallas, Texas 75217

#797    5001 South Buckner Blvd., Dallas, Texas 75217

#799    2600 East Highway 30, Mesquite, Texas 75225

## SCHEDULE 2 – OPTION TO EXTEND TERM

None.

**SCHEDULE 3 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER**

1.    Regular, Super and Premium Gasoline;

2.    Diesel;

3.    E85/and other Ethanol Blends;

4.    Bio Diesel;

5.    Ethanol Free Fuel;

6.    Boutique Fuels (Future);

7.    Natural Gas Related Fuels (Future);

8.    Electric Car Charging Networks (Future);

9.    Lubricants and Oils (Future)

10.  Hydrogen Fuels (Future); and

11.  Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

**SCHEDULE 4 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER**

None.

**SCHEDULE 5 - DEALER'S REPAIR/MAINTENANCE AND EQUIPMENT OBLIGATIONS**

None.

**SCHEDULE 6 - BRANDING**

Supplier reserves the right to change the brand at the Location at any time.

DocuSign Envelope ID: 943B58CE-E556-441B-8089-D44E9620C1B5

### SCHEDULE 7 – FINE SCHEDULE

No Name Tag:                          $25.00

No Uniform:                           $50.00

Illegal Drugs/Drug Paraphenalia:      $500.00

**SCHEDULE 8- ALTERNATIVE SECURITY DEPOSIT PROVISIONS**

The security deposit provisions of section 16 of this Agreement are modified as follows:

Total security deposit shall be $0.

## Mountain Express Oil Co. Field Inspection Evaluation

### Exterior

| | |
|---|---|
| Main Price ID sign functional and lighted | 2 |
| Main Price ID sign unobstructed and free of non-oil company signage | 1 |
| Landscape Free of Trash | 2 |
| Landscape Grass Cut and Neat | 4 |
| Parking Lot Neat and Clean | 2 |
| Parking Lot free of weeds growth | 1 |
| Parking Lot with no potholes | 1 |
| Freshly painted curbs, poles and parking lines | 2 |
| All MPDs functioning correctly | 4 |
| All MPDs clean, free of spider webs and dirt | 1 |
| Pump Islands clean and well maintained | 1 |
| Card reader working with RECEIPT paper present | 2 |
| Credit Card Applications present | 2 |
| Current POP Present and clean | 2 |
| Nozzles and hoses clean/functional | 2 |
| All MPD displays operational | 1 |
| Trash Receptacles not overflowing and CLEAN | 1 |
| Valet supplies present. (Squeegees, paper towel and water) | 2 |
| Spanner clean, lit and well maintained | 1 |
| Canopy fascia maintained and lit | 1 |
| Canopy Clean and well maintained | 1 |
| Canopy lights working | 2 |
| Exterior lights working | 1 |
| Dumpster area clean and without debris | 1 |
| No storage or objects outside the building or at dumpster | 1 |
| No abandoned or illegally parked vehicles | 1 |
| Air & Water hose working outside | 1 |
| Building Exterior clean, painted and well maintained | 1 |
| Building Sidewalk clean, unobstructed and pressure washed | 1 |
| Store windows clean, not cracked and free of extra signage | 1 |
| Front door clean and free of unnecessary signage | 1 |
| Operation hours posted | 1 |

### INTERIOR

| | |
|---|---|
| Odor Free | 1 |
| Comfortable Temperature | 1 |
| Inside Lights working and sufficient light | 1 |
| Clean Floor | 2 |
| Clean Walls / attractive & inviting ambiance | 1 |
| Ceiling tiles spotless and clean | 1 |
| Vents clean and dirt free | 1 |
| Clutter Free merchandising / Dealer navigation friendly | 1 |
| Floor Merchandisers well organized, properly placed and allowing navigation | 1 |

Store #588,589,781,793-7965,797,799          MEX 100% Fuel

25

| | |
|---|---|
| Fully Stocked and Merchandised | 1 |
| No handwritten signs in the store | 1 |
| Shelves clean, free of dirt and front faced | 1 |
| Beverage Bar clean and inviting | 1 |
| Beverage equipment operational | 1 |
| Beverage Bar stocked | 1 |
| Cooler operational and clean | 1 |
| Cooler lights working | 1 |
| Check out area clean, clutter free and inviting | 1 |
| Waste receptacles clean and not overflowing | 1 |
| No storage in Dealer visible sales area | 1 |

### BATHROOMS

| | |
|---|---|
| All available bathrooms open for Dealer use | 1 |
| Bathroom floors clean and neat | 1 |
| Bathroom walls clean and free of graffiti | 1 |
| Bathroom supplies present | 2 |
| Bathroom door clean, lock functioning correctly | 1 |
| Bathroom equipment Commode, urinal, sink, mirror, soap disp, paper disp, towel disp | 1 |
| Bathroom trash clean, not overflowing and well maintained | 2 |

### DEALER SERVICE

| | |
|---|---|
| CSR in Uniform shirt | 5 |
| CSR wearing name tag | 3 |
| CSR well groomed | 1 |
| CSR acknowledged at entry and first interaction | 1 |
| CSR made eye contact | 1 |
| CSR courteous and provides pleasant Dealer service | 1 |
| CSR repeats sales amount and counts cash back | 1 |
| CSR provides welcome and parting remarks | 1 |
| CSR familiar with Oil Co programs and offers program sales | 2 |

### MISC

| | |
|---|---|
| Pornographic Magazine on display | 3 |
| Any type of Drug Paraphernalia present | 3 |
| **TOTAL SCORE** | **100** |

**Mountain Express Oil Company**

Credit Card Schedule Upon
Conversion

| Sales at Store | | Notice to MEX | $$$ to MEX | $$$ to Dealer |
|---|---|---|---|---|
| | | | | |
| Monday | | Tuesday | Wednesday | Thursday |
| Tuesday | | Wednesday | Thursday | Friday |
| Wednesday | | Thursday | Friday | Monday |
| Thursday | | Friday | Monday | Tuesday |
| Friday | | Monday | Monday | Tuesday |
| Saturday | | Monday | Monday | Tuesday |
| Sunday | | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

7 Days
Payment is due within 7 days
from date of delivery.

(Assuming 7-day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| | | |
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

Store #588,589,781,793-7965,797,799          MEX 100% Fuel